1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JAMAL J. CHAMBERS,**<br><br>Petitioner,<br><br>v.<br><br>**GERALD JANDA, Warden,**<br><br>Respondent. | **Case No. 1:13-cv-00230 LJO MJS (HC)**<br><br>**FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent Gerald Janda, Warden at the Calipatria State Prison, is hereby substituted as the proper respondent under Rule 25(d) of the Federal Rules of Civil Procedure.  Respondent is represented by William K. Kim of the office of the Attorney General.

I.     **PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Fresno, following his conviction by jury trial on December 1, 2008, for the attempted murder of a peace officer and associated crimes. (Clerk's Tr. at 717-20.)  Petitioner was sentenced to an indeterminate sentence of thirty-eight (38) years to life in state prison.  (Id.)

1

1  Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate

2  District, which remanded to stay a concurrent sentence imposed on a lesser count for

3  assault with a firearm on a peace officer ("count 12") and affirmed all other aspects of

4  the judgment on November 7, 2011.  (Answer, ECF No. 14, Ex. A.)  On January 25,

5  2012, the California Supreme Court denied review.  (Lodged Doc. 1.)  The Fresno

6  County Superior Court amended the judgment to include a stay on count 12 on March

7  20, 2012.  (Lodged Doc. 2.)

8  Petitioner filed the instant federal habeas petition on February 14, 2013.  (Pet.,

9  ECF No. 1 at 1.) Petitioner presents four claims for relief in the instant petition.

10  Petitioner alleges that he was denied the right to a fair trial by an impartial jury because

11  of (1) the trial court's failure to conduct a further inquiry into juror intimidation; (2) the trial

12  court's refusal to grant a mistrial on the grounds of juror misconduct; and (3) the trial

13  court's error in allowing "a significant number of Clovis Police Officers" in the courtroom

14  while playing exhibits for the jurors.  Further, Petitioner alleges a sentencing error as to

15  count 12.  (Id., Exs. A-D.)

16  Respondent filed an answer on June 07, 2013. (Answer.) The matter stands

17  ready for adjudication.

18  **II.    STATEMENT OF THE FACTS[1]**

19  On August 26, 2006, [Petitioner] and Douglas Jackson attempted to rob a
bank in Clovis but, after finding out no one could open the vault, fled
20  empty-handed and shot at officers during an ensuing police pursuit. A jury
found Chambers guilty of five felonies. On appeal he argues two juror
21  intimidation issues, one juror misconduct issue, and one sentencing issue.

22  (Answer, Ex. A at 1.)

23  **III.   DISCUSSION**

24  **A.    Jurisdiction**

25  Relief by way of a petition for writ of habeas corpus extends to a person in

26

27  [1]The Fifth District Court of Appeal's summary of the facts in its November 7, 2011 opinion is presumed
correct.  28 U.S.C. § 2254(e)(1).

28

2

1   custody pursuant to the judgment of a state court if the custody is in violation of the

2   Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. §

3   2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he

4   suffered violations of his rights as guaranteed by the U.S. Constitution.   (Pet.)   In

5   addition, the conviction challenged arises out of the Fresno County Superior Court,

6   which is located within the jurisdiction of this court.   28 U.S.C. § 2241(d); 2254(a).

7   Accordingly, this Court has jurisdiction over the instant action.

8              **B.**   **Legal Standard of Review**

9        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death

10  Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus

11  filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood,

12  114 F.3d 1484, 1499 (9th Cir. 1997).  The instant petition was filed after the enactment

13  of the AEDPA and is therefore governed by AEDPA provisions.

14       Under AEDPA, a person in custody under a judgment of a state court may only be

15  granted a writ of habeas corpus for violations of the Constitution or laws of the United

16  States.  28 U.S.C. § 2254(a); Williams, 529 U.S. at 375 n. 7.  Federal habeas corpus

17  relief is available for any claim decided on the merits in state court proceedings if the

18  state court's adjudication of the claim:

19       (1) resulted in a decision that was contrary to, or involved an
     unreasonable application of, clearly established federal law, as
20       determined by the Supreme Court of the United States; or

21       (2) resulted in a decision that was based on an unreasonable
     determination of the facts in light of the evidence presented in the State
22       court proceeding.

23  28 U.S.C. § 2254(d).

24              1.   Contrary to or an Unreasonable Application of Federal Law

25       A state court decision is "contrary to" federal law if it "applies a rule that

26  contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

27  that [are] materially indistinguishable from [a Supreme Court case] but reaches a

28  different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at

405-06).  "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied . . . The statute recognizes . . . that even a general standard may be applied in an unreasonable manner."  Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'"  Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court.  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).  A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable."  Id. at 75-76 (quoting Williams, 529 U.S. at 409-10); Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002).  In Harrington v. Richter, the Court further stresses that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  131 S. Ct. 770, 785 (2011) (citing Williams, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)).  Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations."  Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010).  "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  Knowles v. Mirzayance, 129 S. Ct. 1411, 1419 (2009) (quoted by Richter, 131 S. Ct. at 786).

### 2.    Review of State Decisions

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds."  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the "look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

4

(9th Cir. 2006).   Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion, "does not require that there be an opinion from the state court explaining the state court's reasoning."  Richter, 131 S. Ct. at 784-85. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  Id.  "This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  Id.

Richter instructs that whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id. at 786. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents."  Id. (emphasis added).  To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts are the principal forum for asserting constitutional challenges to state convictions."  Id. at 787.   It follows from this consideration that § 2254(d) "complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings."  Id. (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977)).

1         3.       <u>Prejudicial Impact of Constitutional Error</u>

2        The prejudicial impact of any constitutional error is assessed by asking whether

3  the error had "a substantial and injurious effect or influence in determining the jury's

4  verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993); <u>see also</u> <u>Fry v. Pliler</u>, 551

5  U.S. 112, 121-22 (2007) (holding that the <u>Brecht</u> standard applies whether or not the

6  state court recognized the error and reviewed it for harmlessness). Some constitutional

7  errors, however, do not require that the petitioner demonstrate prejudice. <u>See</u> <u>Arizona v.</u>

8  <u>Fulminante</u>, 499 U.S. 279, 310 (1991); <u>United States v. Cronic</u>, 466 U.S. 648, 659

9  (1984).

10  **IV.**    **REVIEW OF PETITION**

11       **A.**    **<u>Law Applicable to the Right to an Impartial Jury</u>**

12        The Sixth Amendment right to a jury trial "guarantees to the criminally accused a

13  fair trial by a panel of impartial, 'indifferent' jurors." <u>Irvin v. Dowd</u>, 366 U.S. 717, 722

14  (1961). A defendant is denied a fair trial if even a single juror is prejudiced or biased.

15  <u>Fields v. Woodford</u>, 281 F.3d 963, 972 (9th Cir. 2002).

16        A hearing is usually held to determine if a juror has become partial due to

17  circumstances. <u>See</u> <u>Smith v. Phillips</u>, 455 U.S. 209, 215 (1982) "This Court has long

18  held that the remedy for allegations of juror partiality is a hearing in which the defendant

19  has the opportunity to prove actual bias." <u>Id.</u> When a trial court finds after a hearing that

20  a juror is not biased, that finding is presumed to be correct. <u>Dyer v. Calderon</u>, 151 F.3d

21  970, 973 (9th Cir. 1998).

22       **B.**    **<u>State Court Decision</u>**

23        Petitioner presented his claims by way of direct appeal to the California Court of

24  Appeal, Fifth Appellate District. The first three claims were denied in a reasoned decision

25  by the Court of Appeal (Answer, Ex. A.) and in a subsequent appeal to the California

26  Supreme Court (Lodged Doc. 1.). The fourth claim was remanded and thereafter

27  granted by the Fresno County Superior Court on March 20, 2012. (Lodged Doc. 2.) As

28  stated earlier, "where there has been one reasoned state judgment rejecting a federal

claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). This is referred to as the "look through" presumption. Id. at 804. Since the Court of Appeal was the last court to issue a reasoned opinion on these issues, this Court "looks through" the California Supreme Court decision to the reasoned analysis of the Court of Appeal. With regard to the jury intimidation claims, the Court of Appeal said in its opinion:

> 1. Claim of Juror Intimidation During Testimony
>
> [Petitioner] argues that the court's failure to conduct an adequate inquiry into possible juror intimidation by spectators violated his constitutional rights to an impartial jury and a fair trial. The Attorney General argues the contrary.
>
> On the 11th day of trial, juror number 3 submitted a letter to the court expressing "concern" about two men in the courtroom who made Jackson's former girlfriend "very nervous" as she testified. The letter referred to a comment about "Lo Boys" in Jackson's fiancé's testimony and to a comment overheard during a break about how the two men were Jackson's cousins. The letter mentioned that several jurors had to step around the two men in the hall. Juror number 3 said she was no "stranger to the Lo Boys and their reputation: but admitted she was not "very comfortable" about their presence and thought other jurors might "feel the same." She wrote, "Please give me the assurance that I will be safe here and there will not be any intimidation from visitors in the courtroom."
>
> In chambers, the court and counsel conferred with juror number 3, who said that other jurors made comments about how the two men made the witness nervous. Hearing Jackson's fiancé refer on stand to Jackson as "Chain or Shane," which "was his Lo[] Boy name." "freaked [her] out a little bit," after which she took off her juror badge. She reported that juror number 5 mentioned leaving her wedding ring at home and feeling nervous about walking to her car. Later, juror number 3 acknowledged "I don't know if I heard Lo[] Boy or not." The court asked, "Has anybody done anything that in any way obviously or subjectively, made you feel personally intimidated?" She answered, "No," adding that she "just…felt uneasy." The court asked, "And you were uneasy because?" She answered, "They were just right there." The court asked, "But they did not look at you? Threaten?" She said, "No." The court asked, "Mouth comments?" She answered, "Absolutely not, no." The court noted that "things like that" are "not unusual for a jury trial. You may have a courtroom full of people on both sides." She said she knew about Fresno gangs only because her "spouse worked for a criminal defense attorney for years." The court asked if any of the jurors mentioned the Lo Boys. She said, "No." Asked if she had formed an opinion about guilt or innocence, she replied, "No." To the question, "And is there anything about what you've heard, seen, or observed inside or outside the courtroom that would impact your ability to be fair and impartial?," she likewise replied, "No."

The court called juror number 5 into chambers and told that her [sic] someone had mentioned she was not wearing her wedding ring because she was nervous. She was just "kidding around," she said. Her wedding ring no longer fits because she gained weight after having her baby. "Anything about any of the local characters or anything else?," the court probed. "Oh, no," she replied, adding that she just gets "nervous around people" and walks "everywhere" in groups.

Out of the presence of juror number 5, the defense asked the court to question the jurors. The court declined the request, noting that it was "extremely reticent to engage in questions of a jury, either before or during deliberations," about the "subjective analysis of the evidence," which included asking jurors about how to analyze "the testimony of a particular witness." The court observed too, that "to carry it further would create actual potential issues that are not present." The court pointed out that the jury was to receive instruction not to consider for any purpose anything that was not evidence, including the activities of others in the courtroom. The court asked the court reporter "what she wrote down" about a possible witness reference to "Lo Boys."

After the noon recess that day, the court, in the presence of counsel and juror number 3 but outside the presence of the rest of the jury, had the court reporter read the portion of Jackson's former girlfriend's testimony that juror number 3 mistakenly thought referred to the Lo Boys. "The testimony was," the court reporter read, "'Chain, like chain?'" and the answer, she read, was, "'No. It is like an old cowboy movie, a long time ago. And his name was Chain, and that's his name they gave him as a little boy.'"

"The decision whether to investigate possible juror bias, incompetence, or misconduct, as well as the ultimate decision whether to retain or discharge a juror, rests within the sounds discretion of the trial court. [Citation.] If any substantial evidence to support the trial court's exercise of its discretion, the court's action will be upheld on appeal." (*People v. Maury* (2003) 30 Cal.4th 342, 434.) As our Supreme Court notes, "a hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a d juror's ability to perform his [or her] duties and would justify his [or her] removal from the case." (*people v. Ray* (1996) 13 Cal.4th 313, 343.)

Here, by questioning juror number 3 at length, questioning juror number 5 briefly, and having the court reporter read back part of Jackson's former girlfriend's testimony, the court found that juror number 3 was mistaken in her recollection that the witness said "Lo Boy" (when, in fact, she said "cowboy") and that juror number 5's comment about not wearing her wedding ring because she was nervous was only a joke. [Petitioner] agrees the court resolved juror number 3's initial concern but argues that the discussion of the case by the jurors violated section 1122 and that the court should have conducted a further inquiry. [**FN3**]

> **FN3.** In Part, section 1122 provides, "(a) After the jury has been sworn . . . the court shall instruct the jury generally concerning its basic functions, duties, and conduct. The instructions shall include, among other matters, admonitions that the jurors shall not converse among themselves, or with anyone else, on any subject connected with the trial; . . . and

8

that they shall promptly report to the court any incident within their knowledge involving an attempt by any person to improperly influence any member of the jury. (b) The jury shall also, at each adjournment of the court before the submission of the cause to the jury, whether permitted to separate or kept in charge of officers, be admonished by the court that it is their duty not to converse among themselves, of with anyone else, on any subject connected with the trial, or to form or express any opinion thereon until the cause is finally submitted to them." (§ 1122.)

The Attorney General argues that the juror comments at issue here, though a breach of the court's section 1122 admonitions, showed no prejudgment of the case. We agree. "Trivial violations that do not prejudice the parties do not require removal of a sitting juror." (*People v. Wilson* (2008) 44 Cal.4th 758, 839 (*Wilson*).) The comments here neither suggest prejudgment of guilt nor cast doubt on the impartiality of the jurors or the fairness of the trial. Juror comments like those are "'certainly not as serious as questions designed to obtain extrinsic evidence regarding the case itself.'" (*Ibid.*) "No trials are perfect –evidentiary or procedural errors are bound to occur." (*People v. Garcia* (2005) 36 Cal.4th 777, 808 (conc. & dis. opn. of Chin, J.).) [Petitioner] fails to persuade us that the court should have conducted further inquiry.

*2. Claim of Juror Prejudgment of Case*

[Petitioner] argues that the court's denial of his motion for a mistrial on the ground that jurors prejudged the case violated his constitutional rights to an impartial jury and a fair trial. The Attorney General argues the contrary.

On the 17th day of trial, juror number 1 submitted a note to the court stating, "A comment was made this week that the prosecutor has not done his job so there's no need for a long defense. I am concerned that an attempt was made to taint the jury." Once the court brought her into chambers, she elaborated, "And in my mind I thought why would she say something like that. We are not supposed to make a decision at all until we have heard both sides." She identified the juror who made the comment as juror number 5 and said that juror number 10 responded with something like "yeah, right" but said she did not know whether he was agreeing or being facetious because "those two kind of buddy up with each other" She said, "I heard it, and I just let it go," but agreed to write the note after some other jurors at lunch said the court should be informed.

After juror number 1 left, the court brought juror number 5 into chambers and asked her about her comment. She said some jurors said things like "they're guilty" and "DNA doesn't lie" and that afterward she said "the DA hasn't done his job yet." She denied saying "there's no need for a long defense." She might have said the "defense is not getting that much longer because [she] heard it's only a few days or a week for [the] defense."

After juror number 5 left, the court brought juror number 10 into chambers and asked him about his "yeah, or right, or something" comment in response to the comment juror number 5 made. Juror number 10 said he did not recall making that statement but did say "there has been a lot of talking of everybody in there about the case." Asked by the court to

elaborate, he said everyone was "giving some point of view or input about how they feel about the case, but not into specific of guilty verdict or no[t] guilty verdict." For example, "that witness didn't help anybody or things like that." He said that he had his "own belief of things that may have happened or may not have happened" but still did not "have a completed verdict of not guilty or guilty." Although he was "leaning towards one way," he said he was "still being very fair."

After juror number 10 left, the defense made a motion to interview each juror and made a motion for a mistrial. The prosecutor made a motion to dismiss juror number 5. The court granted the motion to interview each juror – individually, in chambers, in the presence of counsel, and out of the presence of the defendants – and deferred rulings on the other motions.

The court asked juror number 2 if he had heard anything "that has troubled you about anyone having the ability to have a fair trial either side, prosecution, or defense." He said most of the comments were "trivial" like "that witness was funny" and "more like kind of killing time." He said that "everyone has been really careful" not to talk "about the case itself or the evidence or like the believability of the witnesses or the lawyers." The "one comment" he had heard "over the last two weeks that shouldn't have been made" was "the problematic one" by juror number 5 about "they don't need to do anything because the DA hasn't shown enough or something like that." He said "nothing at all" had happened to make him other than a fair and impartial juror.

The court asked juror number 3 if "any conversations or comments" had led her to believe she "could not be fair and impartial." She replied, "No." Other than flip remarks jurors made to get to know each other, the only comment she thought was inappropriate was juror number 5's comment that "the prosecution's not doing their job," a comment that made her think, "when we go into deliberations, she might be a problem." That was the only time "anybody has said anything" that led her to believe "that maybe an opinion had already been formed. And that's why I thought it was out of line."

The court asked juror number 4 if she had heard anything, "just listening to other jurors, that they've made inappropriate statements or have formed opinions about the case that would make them less than impartial." He replied, "No," and said he had not "heard anybody saying anything about the case at all."

The court asked juror number 6 if he had "heard anything from anyone" that would lead him to believe "somebody has made up their mind, not made up their mind, not listening, not following the [] rules." He replied, "No," adding he talks to few people and keeps to himself. Asked by the court if "some discussion, apparently somebody was in the courtroom," that led to "an interchange or something," gave him "any pause for concern" about "being fair and impartial or intimidated or anything like that," he replied, "No, it probably won't be." Asked by the court if he had "heard anyone speak about like they've made up their mind or something like that," he shook his head.

The court asked juror number 7 if there had been any conversations that would lead her "to think that any jurors made up their mind or are speaking inappropriately about things they shouldn't be speaking about." There had

been "comments practically by everybody," she replied, not "about the case" or "anything to do with innocent, guilty," but about things like how one of the witnesses "should have zipped up her jacket. Just things like that."

The court asked juror number 8 if he had heard "any comments about this case from jurors that gave [him] any pause for concern." Replying in the affirmative, he said that a juror made a comment about how "the defense didn't need much time because the prosecution case was so weak." Her comment bothered him. "She shouldn't be saying anything like that one way or the other." He said that nobody made a comment to her at the time but that there was some discussion afterward. "She laughs all the time," he said, and "doesn't seem to be taking this very seriously like a lot of us."

The court asked juror number 9 if he had heard anyone make "comments that they shouldn't have made" that would lead him to think "maybe they formed an opinion." He said he had not "really been talking with the other jurors," had "just been paying attention to the trial," and had not "heard anything actually." Asked by the court if anything had "happened that would give [him] any cause to think [he] could not continue to be fair and impartial," he replied, "No, nothing."

The court asked juror number 11 if she had heard "any comments about this case from anybody, anything from any of [her] fellow jurors that gives [her] any pause." [**FN4**] She replied, "No," adding that she had heard some comments but "nothing trying to persuade anyone." Nothing came to mind that would cause her to think she could not be fair and impartial.

> **FN4.** By stipulation, the court previously had excused original juror number 11 for hardship and had seated original alternate juror 2 as new juror number 11.

The court asked juror number 12 if he had heard "anything, any comments by any juror that would give [him] any pause for concern about being fair and impartial." He replied, "No."

The court asked juror number 3 if she had heard "any comments by any juror that would give [her] pause for concern." She replied, "Yes." Asked for details, she said that after one of the jurors said the defense was "only going to be a day" juror number 5 said "something to the effect we don't even need a defense because the prosecution didn't do their job." She added, "And it was kind of quiet after that. Everybody looked at each other." That was the first time anyone said something "that should not have been said."

At that juncture, the court, having interviewed each juror individually, brought juror number 5 back into chambers to "follow-up on a couple of things." Asked by the court about the DNA comment, she said she remembered "someone saying DNA doesn't lie." She said she was "not sure" if that person "said we might as well vote guilty" but that is "what [she] got from that." She had "the feeling that people are choosing sides already." Asked by the court if she had chosen sides, she replied, "Honestly, I haven't.". She said she had a feeling "a few jurors don't like [her]" because she is "blunt" and "outspoken" but she insisted she could "listen to everybody" during deliberations.

Back in the courtroom, the court admonished all of the jurors together not to "talk about the case or about any of the people or any subject involved in the case" until "after the evidence has been presented, the attorneys have completed their arguments," the court has instructed on the law, and deliberations have begun. The court the excused the jury for the day, denied the defense motion for a mistrial, and denied the prosecutor's motion to dismiss juror number 5.

"Undeniably, the juror's comments were a breach of the court's [section 1122] admonitions," the Attorney General acknowledges. Not every insignificant infraction of the rules by a juror calls for a new trial, however. "Where the misconduct is of such trifling nature that it could not in the nature of things have prevented either party from having a fair trial, the verdict should not be set aside." (*Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th 499, 507.)

A court should grant a motion for a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged by prejudice that is incurable by admonition or instruction. (*People v. Avila* (2006) 38 Cal.4th 491, 573 (*Avila*).) Since the determination whether an incident is incurably prejudicial is intrinsically speculative, a court has considerable discretion in ruling on a motion for mistrial. (*Ibid.*) The standard of review of a court's ruling on a motion for a mistrial is abuse of discretion. (*Ibid.*)

Here, the record shows no abuse of discretion. As the court's interviews with all of the jurors show, some perceptions differed, some recollections diverged, and some jurors might have formed some opinions about the case. Yet the record affirmatively shows that not even one juror had already made up his or her mind about the case. Although "jurors are told not to discuss the case until all the evidence has been presented and instructions given, they are not precluded from thinking about the case, nor would that be humanly possible." (*Wilson, supra,* 44 Cal.4th at p. 840.) [Petitioner] claims that the denial of his motion violated his constitutional rights to an impartial jury and a fair trial, but since the premise of his constitutional claims is that the denial of his motion was prejudicial, his constitutional claims likewise fail. (*People v. Sanders* (1995) 11 Cal.4th 475, 510, fn. 3 (*Sanders*).)

*3. Claim of Juror Intimidation During Deliberations*

[Petitioner] argues that the court's denial of his motions for a mistrial and a new trial on the ground of the presence of police officers in the audience during replays of audio and video exhibits in open court violated his constitutional rights to an impartial jury and a fair trial. The Attorney General argues the contrary.

During deliberations, the jury asked for replays of audio and video exhibits, clarification of instructions, and readback of witness testimony. Noting that "setting up all the equipment" makes a replay "different than a readback," the court had the replays in open court, not in the jury room. The court clarified the instructions in open court, too, but had the court reporter do the readback in the jury room.

After the jury retired to the jury room for readback, the defense objected to replays of the audio and video exhibits of the police pursuit in open court when about 10 police officers, some of whom were victims or witnesses,

were in the audience. Analogizing a replay to readback, the defense urged, "This should be done in the jury room," arguing that "police and witnesses are never present during read back" and that a replay in open court "taints any type of deliberations." The court replied, "It is an open courtroom. This is not testimony," noting that technological difficulties of replays made putting those burdens on a bailiff in the jury room inappropriate. The court noted the importance of counsel being "able to observe what is being observed and how it's being [set] forth. This is a public courtroom nonetheless, and I do not believe there is any legal basis to close the courtroom."

The defense made an oral motion for a mistrial on the basis of a due process violation of the right to an impartial jury. Counsel argued that the prosecutor invited the officers to come to open court during the replays "to prejudice the jury" and pointed out that every juror looked at the officers wearing badges and weapons in open court. In the alternative, the defense requested an admonishment to the jury that the presence of the officers should not taint the deliberations. The court acknowledged "a number of people in the courtroom," some of whom, the defense interjected, were "police officers" and "victims." On the basis of having watched the audience "very carefully," the court noted, the were no "signs, symbols, nonverbal communication, facial expressions by anyone." The prosecution said he invited the officers, who had "every right to be here." The court found no indication of any misbehavior by anyone, declined to "insult any folks that are here" by "admonishing them as to their conduct," and denied the motion.

After the replays in open court, the defense filed a written motion for a mistrial. The court cautioned the jury that "the only evidence you're to consider is what happens from the witness stand or evidence that is put on the record in some fashion during the course of trial." The court added, "What we're doing or people in the audience that may be here throughout, including yesterday, are not to be considered for any purpose." After hearing argument, the court observed that when "these jurors were in this courtroom, they were not deliberating" and that the spectators showed no "intent to influence the jurors in any way" and did nothing to indicate their presence was "other than as members of the public." The court commented, too, that after admonishing the jury the court "made eye contact with each of the 12" jurors in the period of silence that followed and perceived "tacit agreement" with the admonishment. The court denied the motion.

After the jury's verdicts, the defense filed a motion for a new trial on the ground that the court's "allowing the prosecutor to fill the courtroom with police officers during jury deliberations at a time when the jury had presented a question to the court regarding the attempted murder charge" intimidated the jury into returning a guilty verdict on that charge. The prosecutor filed an opposition. After hearing argument, the court denied the motion.

"Every person charged with a criminal offense has a constitutional right to a public trial, that is, a trial which is open to the general public at all times. (See U.S. Const., amends. VI, XIV; Cal. Const., art. I, § 15; see also [] § 686, subd. 1.)" (*People v. Woodward* (1992) 4 Cal.4th 376 382 (*Woodward*).) "Given the importance of public trials to both the accused and the public, there is a ""presumption of openness"" in the courtroom

that "'"may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."'" (*People v. Baldwin* (2006) 142 Cal.App.4th 1416, 1421, quoting *Waller v. Georgia* (1984) 467 U.S. 39, 45 (*Waller*).) Public trials not only "provide an opportunity for spectators to observe the judicial system" but also "prompt judges, lawyers, witnesses and jurors to perform their duties more conscientiously." (*Baldwin*, *supra*, at p. 1421.)

Relying primarily on *People v. Feagin* (1995) 34 Cal.App.4th 1427, [Petitioner] argues that proceedings during deliberations are generally outside the scope of the public trial right. The issue in *Feagin* was whether a court denies that right by holding a hearing on juror misconduct in chambers. (*Id.* at p. 1438.) On that issue, *Feagin* held that the presumption of openness was rebutted by showing that the exclusion of the public was necessary to protect the sensitive nature of juror disclosures. (*Id.* at p. 1439.) *Feagin* is inapposite. Citing no persuasive authority and suggesting no plausible justification for excepting the proceedings at issue from the public trial right, [Petitioner] fails to make the requisite showing of a "higher value such as the defendant's right to a fair trial or the government's interest in preserving the confidentiality of the proceedings." (*Ibid.*, citing *Woodward, supra,* 4 Cal.4th at p. 383.) On the record before us, we conclude that the proceedings at issue were within the scope of the public trial right.

The standard for review of a court's ruling on a motion for a mistrial is abuse of discretion (*Avila, supra,* 38 Cal.4th at p. 573), as is the standard for review of a court's ruling on a motion for a new trial (P*eople v. Coffman and Marlow* (2004) 34 Cal.4th 1, 127). Here the record shows no abuse of discretion. The court's thorough observations of the demeanor of the persons in the courtroom during the proceeding at issue refute the entirely speculative nature of [Petitioner's] argument. [Petitioner] contends the denial of his motion violated his constitutional rights to an impartial jury and a fair trial, but since the premise of his constitutional claims is that the denial of his motions was prejudicial, his constitutional claims likewise fail. (*Sanders, supra,* 11 Cal.4th at p. 510, fn. 3.)

*4. Stay of Concurrent Term*

[Petitioner] argues that the court should have stayed the concurrent term imposed on the assault with a firearm on a peace officer (§ 245, subd. (d)(1)) with personal use of a firearm (§ 12022.5, subd. (a)). His rationale is that section 654 prohibits punishment for two offenses arising out of an indivisible course of conduct, which links the assault and the attempted willful, deliberate, and premeditated murder of a peace officer (§§ 187, subd. (a), 664, subd. (e)) with personal use of a firearm (§ 12022.53, subd. (b)) and personal and intentional discharge of a firearm (§ 12022.53, subd. (c)), on which the court imposed sentence without a stay.

Chambers notes that the court stayed the concurrent term on the assault at Jackson's sentencing, argues that there is no difference between him and Jackson in terms of indivisibility of the course of conduct that involved the same officer in both offenses, and characterizes as an inadvertence the court's failure to issue a stay. (See *People v. Lewis* (2008) 43 Cal.4th 415, 519)

The Attorney General expresses "no objection" to a stay and notes that

1   the prosecutor stated at the probation and sentencing hearing that the court should stay the concurrent term imposed on the assault. We agree.

2   *Disposition*

3   The matter is remanded for the court (1) to stay the concurrent 18-year term in count 12 consisting of an eight-year (aggravated) term for assault
4   with a firearm on a peace officer (§ 245, subd. (d)(1)) plus a 10-year enhancement (the aggravated term) for personal use of a firearm (§
5   12022.5, subd. (a)), (2) to amend the abstract of judgment accordingly, and (3) to send a certified copy of the abstract of judgment so amended to
6   the Department of Corrections and Rehabilitation. [Petitioner] has no right to be present at those proceedings. (See *People v. Virgil* (2011) 51
7   Cal.4th 1210, 1234-1235.) In all other respects, the judgment is affirmed.

8   (Answer, Ex. A at 2-9.)

9   **C.   Analysis**

10   Here, providing the state court decision with appropriate deference for each of

11   Petitioner's three contentions regarding juror misconduct, there is at least a possibility

12   that fair-minded jurists could agree with the state court decision that the jurors were

13   impartial and Petitioner was not deprived of his right to a fair trial.

14   1.   Claim One: Intimidation of Jurors

15   Petitioner contends that he was deprived of the right to a fair trial and an impartial

16   jury because the court failed to adequately investigate the possible intimidation of jurors.

17   (Pet. at 14.)   Petitioner states that "the court should have conducted further inquiry to

18   determine whether any of the jurors were affected by the two men and the comments

19   made by other jurors, whether they felt intimidated, and whether they could still be

20   impartial."   (Id.)   Petitioner further claims that the jury discussion of the two men "was

21   also jury misconduct and a violation of [California] Penal Code section 1122, subdivision

22   (b) to discuss the case." (Id.)   However, as the Court of Appeal stated in its reasoned

23   opinion:

24   The Attorney General argues that the juror comments at issue here, though a breach of the court's section 1122 admonitions, showed no
25   prejudgment of the case. We agree. "Trivial violations that do not prejudice the parties do not require removal of a sitting juror." (*People v. Wilson*
26   (2008) 44 Cal.4th 758, 839 (*Wilson*).) The comments here neither suggest prejudgment of guilt nor cast doubt on the impartiality of the jurors or the
27   fairness of the trial. Juror comments like those are "'certainly not as serious as questions designed to obtain extrinsic evidence regarding the
28   case itself.'" (*Ibid.*) "No trials are perfect –evidentiary or procedural errors

are bound to occur." (*People v. Garcia* (2005) 36 Cal.4th 777, 808 (conc. & dis. opn. of Chin, J.).) [Petitioner] fails to persuade us that the court should have conducted further inquiry.

(Answer, Ex. A at 4.)

Petitioner also argues that juror misconduct raises a presumption of prejudice. (Pet. at 15) (citing *People v. Majors,* 18 Cal.4th 385, 417 (1998); *People v. Diaz*, 152 Cal.App.3d 926, 934 (1984)). However, the Court of Appeal also found that the California Penal Code section 1122 violation of the admonition not to discuss the case did not prejudice the parties. (Answer, Ex. A at 4.)  As stated in <u>Bradshaw v. Richey</u>, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  546 U.S. 74, 76 (2005).  This Court cannot question the state court's ruling on whether prejudice could be found due to the violation of a state law.

Here, the California Court of Appeal found that there was no support in the record for Petitioner's claim that the jury panel had been tainted.  The state appellate court conducted an exhaustive examination of the juror's responses to questions from the trial court regarding being intimidated by observers in the courtroom.  As none of the comments made by juror number 3 gave any reason to suspect that the other jurors (other than juror number 5, who was questioned) were feeling intimidated, there would be no reason to conduct a further inquiry into the partiality of the other jurors.  The responses of jurors 3 and 5 indicated that they would reach a decision based solely on the evidence rather than any fears or prejudice; thereby indicating a lack of actual bias. The fundamental and applicable principle here is that due process "means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." <u>Phillips</u>, 455 U.S. at 217. It appears that the trial court undertook appropriate action to ensure that the jury was not swayed by potential intimidation.

Petitioner has not presented any evidence to rebut the presumption of

1    correctness attached to the appellate court's finding that there was no jury intimidation.

2    The Court finds the state court's decision, that Petitioner's constitutional right to an

3    impartial jury was not violated by the trial court's refusal to discharge the jury panel, was

4    not "contrary to, nor involved an unreasonable application of, clearly established Federal

5    law, as determined by the Supreme Court of the United States; nor resulted in a decision

6    that was based on an unreasonable determination of the facts in light of the evidence

7    presented in the State court proceeding."  28 U.S.C. § 2254(d).  For these reasons, it is

8    recommended that the claim be denied.

9                    2.    Claim Two: Improper Juror Conduct Necessitating Mistrial

10          Petitioner contends that the "jurors were talking about the case…in direct violation

11   of [California] Penal Code section 1122."  (Pet. at 23.)  Petitioner further asserts that

12   "some jurors had made up their minds" due to comments like "DNA doesn't lie."  (Id.)

13   However, the state court denied this claim in a reasoned decision stating:

14          A court should grant a motion for a mistrial only when a party's chances of
           receiving a fair trial have been irreparably damaged by prejudice that is
15         incurable by admonition or instruction. (*People v. Avila* (2006) 38 Cal.4th
           491, 573 (*Avila*).) Since the determination whether an incident is incurably
16         prejudicial is intrinsically speculative, a court has considerable discretion
           in ruling on a motion for mistrial. (*Ibid.*) The standard of review of a court's
17         ruling on a motion for a mistrial is abuse of discretion. (*Ibid.*)

18          Here, the record shows no abuse of discretion. As the court's interviews
           with all of the jurors show, some perceptions differed, some recollections
19         diverged, and some jurors might have formed some opinions about the
           case. Yet the record affirmatively shows that not even one juror had
20         already made up his or her mind about the case. Although "jurors are told
           not to discuss the case until all the evidence has been presented and
21         instructions given, they are not precluded from thinking about the case,
           nor would that be humanly possible." (*Wilson, supra,* 44 Cal.4th at p. 840.)
22         [Petitioner] claims that the denial of his motion violated his constitutional
           rights to an impartial jury and a fair trial, but since the premise of his
23         constitutional claims is that the denial of his motion was prejudicial, his
           constitutional claims likewise fail. (*People v. Sanders* (1995) 11 Cal.4th
24         475, 510, fn. 3 (*Sanders*).)

25   (Answer, Ex. A at 7.)

26          This Court cannot review a state court's application of the standard for granting a

27   mistrial as that is a question of state law.  Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

28   Petitioner's underlying claim that some or all of the jurors had prejudged the case was

1    also denied by the Court of Appeal.  As stated above, the jurors were interviewed
2    individually and affirmatively stated that they had not made up their minds as to a
3    guilty/not guilty verdict.  (Answer, Ex. A at 7.)  Unconstitutional prejudgment only occurs
4    if one of the jurors would not render a verdict based on all of the evidence presented.
5    Davis v. Woodford, 384 F.3d 628, 653 (9th Cir. 2004).  On the word of the jurors, the
6    state court made the reasonable determination that the jurors had not foreclosed their
7    opinions and would hear all of the evidence presented.  Fairminded jurists could agree
8    with this state court decision, and Petitioner is therefore not entitled to relief with regard
9    to this claim.

10                    3.    Claim Three: Intimidation by the Presence of Police Officers

11           Petitioner contends that he was deprived of his right to a fair trial and an impartial
12   jury due to the presence of police officers in the courtroom while the jury was
13   deliberating and watching video exhibits.  (Pet. at 35.)  Petitioner states "10 to 15 police
14   officers were in the courtroom" who "were undoubtedly sending the message that they
15   wanted convictions."  (Id.)  Petitioner also points to two aggravating factors, "the display
16   and resultant message were made during deliberations… [and] it was a deliberate
17   attempt by the prosecution to affect the verdicts."  (Id. at 35-36.)  As evidence of the
18   second factor, Petitioner asserts that the prosecutor called at least one of the officers
19   and asked him to be present during the showing of the video.  (Id. at 38.)  Petitioner
20   notes also that "Ms. Hall overheard the prosecutor tell the officers that they could leave if
21   they wished because the jury had seen enough of them."  (Id.) (citing Rprtr's Tr. at
22   4236).  To the extent that Petitioner challenges claims of state law, again, this court
23   cannot disturb such decisions on habeas review.  Bradshaw v. Richey, 546 U.S. at 76.
24   However, the Court shall determine whether underlying prejudice, which may have
25   resulted due to the presence of police spectators, violated Petitioner's federal rights.

26           As previously stated, in order for a state decision to be an unreasonable
27   application of federal law under § 2254(d)(1), the Supreme Court's prior decisions must
28   provide a governing legal principle to the issue before the state court.  Lockyer v.

1  <u>Andrade</u>, 538 U.S. 63, 70-71 (2003).  In this case, as Respondent points out, there is no

2  governing legal principle as to spectator conduct.  (Answer at 21.)

3      In contrast to state-sponsored courtroom practices, the effect on a
   defendant's fair-trial rights of the spectator conduct…is an open question
4  in our jurisprudence. This Court has never addressed a claim that such
   private-actor courtroom conduct was so inherently prejudicial that it
5  deprived a defendant of a fair trial.

6  <u>Carey v. Musladin</u>, 549 U.S. 70, 76 (2006).

7      As such, the state court's decision as to the police presence was not an

8  unreasonable application of any principle previously established by the Supreme Court.

9  Fairminded jurists could agree with the correctness of the state court decision that the

10  presence of the police officers during deliberation did not create a partial jury or deprive

11  Petitioner of his right to a fair trial.  Petitioner is therefore not entitled to relief with regard

12  to this claim.

13              4.      <u>Claim Four: Staying the Sentence on Count 12</u>

14      Petitioner contends that his sentence on Count 12 should have been stayed in the

15  same manner as in the sentence received by his co-defendant Jackson for the same

16  crimes.  (Pet. at 43-46.)  Not only is this court unable to review decisions of state law,

17  <u>Bradshaw v. Richey</u>, 546 U.S. at 76, but Petitioner's sentence on Count 12 was stayed

18  on March 20, 2012.  (Lodged Doc. 2.)  As such, Petitioner has already received relief

19  with regard to this claim thereby making it moot.

20      As to all four of Petitioner's claims, the state court did not apply any federal law in

21  a manner that was contrary to, or involved an unreasonable application of clearly

22  established federal law, nor did it base its holding on an unreasonable determination of

23  the facts in light of the evidence presented.   28 U.S.C. § 2254(d).   The Court

24  recommends that the petition for writ of habeas corpus be denied.

25  **IV.    RECOMMENDATION**

26      Accordingly, it is hereby recommended that the petition for a writ of habeas

27  corpus be DENIED with prejudice.

28      This Findings and Recommendation is submitted to the assigned District Judge,

1   pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty (30) days after

2   being served with the Findings and Recommendation, any party may file written

3   objections with the Court and serve a copy on all parties.  Such a document should be

4   captioned "Objections to Magistrate Judge's Findings and Recommendation."  Any reply

5   to the objections shall be served and filed within fourteen (14) days after service of the

6   objections.  The parties are advised that failure to file objections within the specified time

7   may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153

8   (9th Cir. 1991).

9

10

11

12   IT IS SO ORDERED.

13        Dated:   __August 5, 2013__                    ___/s/ *Michael J. Seng*

14                                                  UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28